UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL LOPEZ,<br><br>    Petitioner,<br><br>  v.<br><br>A. P. KANE, warden,<br><br>    Respondent.<br>_____ / | No. C 05-5034 MHP (pr)<br><br>**ORDER DENYING HABEAS PETITION** |

## INTRODUCTION

Daniel Lopez, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Daniel Lopez was convicted on a guilty plea in Orange County Superior Court of second degree murder. In March 1995, he was sentenced to a term of 15 years to life in prison. His habeas petition does not concern that conviction directly, but instead focuses on a January 7, 2004 decision by a panel of the Board of Prison Terms (now known as the Board of Parole Hearings ("BPH")) finding him not suitable for parole. The hearing was Lopez's first parole consideration hearing and occurred a year before his minimum eligible parole date of April 11, 2004. See Resp. Exh. 2. This petition is unusual in that it is brought by a petitioner who had not even reached the earliest date at which he legally could have been paroled.

The BPH identified several factors in support of its determination that Lopez was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he was released. The factors identified included the circumstances of the murder, his unstable social history, and his need to participate in further self-help programming. The BPH also noted his need to upgrade vocationally while in prison. The BPH ordered a new psychological evaluation with specific directions for the psychologist to read the autopsy report because the physical evidence appeared inconsistent with Lopez's explanation of the events on the night the victim died and the psychologist had apparently relied on Lopez's explanation. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Lopez sought relief in the California courts. The Orange County Superior Court denied his petition for writ of habeas corpus on October 26, 2004 in a reasoned order. Resp. Exh. 7. The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review. Resp. Exhs. 8-11.

Lopez then filed his federal petition for writ of habeas corpus. The court construed Lopez's federal petition for writ of habeas corpus to allege two claims: (1) his right to due process was violated because there was not sufficient evidence to support the BPH's decision and (2) the decision violated the terms of his plea bargain. Respondent filed an answer. Lopez filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because Lopez is housed and the challenged action occurred at the Correctional Training Facility in Soledad. Soledad is in Monterey County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

2

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.  Sufficiency Of Evidence Claim

  1.  Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

A critical issue in parole denial cases concerns the BPH's use of evidence about the murder that led to the conviction. Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 479 F.3d 658 (9th Cir. 2007). Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not

4

our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Recently, Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 479 F.3d at 665; see e.g., id. at 660 (inmate in 16th actual year of his 17-to-life sentence).

The message of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to

5

1  answer the question, "'some evidence' of what?"

2          2.        <u>State Law Standards For Parole For Murderers In California</u>

3          California uses indeterminate sentences for most non-capital murderers, with the term
4  being life imprisonment and parole eligibility after a certain minimum number of years.  A
5  first degree murder conviction yields a base term of 25 years to life and a second degree
6  murder conviction yields a base term of 15 years to life imprisonment.  <u>See</u> <u>In re</u>
7  <u>Dannenberg</u>, 34 Cal. 4th 1061, 1078 (Cal.), <u>cert. denied</u>, 126 S. Ct. 92 (2005); Cal. Penal
8  Code § 190.   The upshot of California's parole scheme described below is that a release date
9  normally must be set unless various factors exist, but the "unless" qualifier is substantial.

10         A BPH panel meets with an inmate one year before the prisoner's minimum eligible
11 release date "and shall normally set a parole release date. . . . The release date shall be set in a
12 manner that will provide uniform terms for offenses of similar gravity and magnitude in
13 respect to their threat to the public, and that will comply with the sentencing rules that the
14 Judicial Council may issue and any sentencing information relevant to the setting of parole
15 release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the
16 panel "shall set a release date unless it determines that the gravity of the current convicted
17 offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
18 is such that consideration of the public safety requires a more lengthy period of incarceration
19 for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.
20 Penal Code § 3041(b).

21         One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole
22 date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A
23 parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A
24 parole date set under this article shall be set in a manner that provides uniform terms for
25 offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The
26 regulation also provides that "[t]he panel shall first determine whether the life prisoner is
27 suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be
28 found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose

6

an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires the prisoner first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole"). The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

7

3. <u>Some Evidence Supports The BPH's Decision In Lopez's Case</u>

The BPH identified several factors supporting its decision to find Lopez unsuitable for parole: the circumstances of the murder, his unstable social history, and his need to participate in further self-help programming. The Orange County Superior Court upheld the decision in a reasoned order. <u>See</u> Resp. Exh. 7. That court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to <u>In re Rosenkrantz</u>, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the <u>Superintendent v. Hill</u> some evidence standard as the proper standard for judicial review of evidentiary sufficiency for parole denial cases. <u>See</u> <u>Rosenkrantz</u>, 29 Cal. 4th at 665-67. Because the Orange County Superior Court's decision is the last reasoned decision, that is the decision to which § 2254(d) applies. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 2041 (2006).

  a. <u>Commitment Offense</u>

The facts of the crime were described in a report prepared by an investigator for the BPH because there was no probation report or trial transcript for Lopez:

> Lopez and the victim had been cohabiting for approximately seven years and had a history of physical and verbal confrontations. On April 10th, 1994 the victim and Lopez became involved in a fight while in the locked bathroom of the residence they shared with another family. . . . Lopez was observed beating on the victim while she was on the bathroom floor. Cause of death was determined to be blunt force trauma to the head and body along with strangulation and drowning. Lopez fled the scene and surrendered himself to the Santa Ana police 12 hours after the incident. When the officers arrived at the scene they found the victim lying on her back in the bathroom or on the bathroom floor. The victim was nude from the waist up and her blouse was located on the floor just above her head. The victim's head was wet and her upper torso and the floor around the body was wet. Witness Ronald Rivera reported that Lopez and his common-law wife Laverne had moved in approximately nine months previously. He advised that Lopez is the brother-in-law of his wife's brother. He reported that Lopez and Laverne had been drinking and watching television all afternoon. He stated that he became interested in a movie and lost track of them. He last observed them walking towards the rear bedroom where he presumed they were going to watch television. His attention was drawn to the yelling and screaming of his son and Laverne's daughter, Melissa, who was banging on the bathroom door. He advised when he went over to see what was going on, he walked in the bathroom and found Laverne lying on the bathroom floor. Rivera's son, Ronald Junior, reported that he heard a loud thud and could hear gurgling noises coming from the bathroom. He observed Lopez in the locked bathroom and Laverne on the floor. Lopez slapped Laverne on the face several times. Ronald Junior stated that he could observe the

8

> incident through the crack between the bottom of the door and the floor. The daughter of the victim, Melissa Macardo (phonetic) stated she observed Lopez striking her mother while they were on the floor. She reported that she had heard a loud noise coming from the bathroom and when she went to investigate she could hear them inside. She could hear slapping noises, and when she looked through the crack between the bottom of the door and the floor she could see Lopez on top of her mother striking her several times. Melissa tried to force her way in but Lopez had the door closed and was holding it shut. When Melissa finally gained access to the room she found her mother lying on the floor and not breathing. Lopez was gone.

RT 8-11; see also Resp. Exhs. 13 and 14.

Lopez disputed virtually everything in the report, claiming that he was innocent. His version was that the victim passed out while smoking rock cocaine and that she died either due to her drug use or accidentally during his attempts to revive her. He admitted he was responsible – but only for not performing CPR or using better judgment to obtain help for the victim when she passed out. RT 18. He asserted at the BPH hearing that the 11 and 13 year-old children's powers of observation were impaired because they had been drinking alcohol, that the bra around the victim's neck had not been used to strangle her but instead must have edged up there as he repeatedly tried to pick up the victim and she slipped from his grasp, that the hemorrhaging in her throat area that the coroner thought indicated strangulation was from him having his hand and her bra around her neck as he tried to pick her up, that he was slapping the victim to revive her rather than hurt her, that the numerous injuries to her body (including blunt force traumas to the head and a traumatic blow to the kidney that caused hemorrhaging as noted in the autopsy report) must have occurred when she fell as he picked her up a few times to revive her, that the water in her lungs noted in the autopsy report must have been her own bodily fluids drowning her, that her saliva was in the toilet because she spat in it while smoking crack cocaine, and the victim's topless state was because her blouse slipped over her arms and head as he tried to pick her up. See RT 11-19, 53-55. Lopez weighed about 25 pounds less than the victim. See RT 55, 68. He claimed he pled guilty on the advice of his lawyer and offered no further explanation of the motivation for the guilty plea. RT 17.

A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code

1 Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance
2 exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate
3 and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled
4 or mutilated during or after the offense," "[t]he offense was carried out in a manner which
5 demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for
6 the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. §
7 2402(c)(1). The BPH considered a circumstance and factors proper under California law.

8       The BPH considered the circumstances of the murder and concluded that it indicated
9 unsuitability. "The offense was carried out in an especially violent and brutal manner, the
10 offense was carried out in a manner that demonstrates a disregard for human life and the
11 motive for the crime is inexplicable and very trivial in relation to the offense." RT 63-64; see
12 also RT 65 ("The prisoner committed the offense in an especially violent manner, the offense
13 was carried out in a dispassionate manner, the offense was carried out in a manner which
14 demonstrates callous disregard for human life.") The BPH completely rejected Lopez's
15 innocent cast on all the physical evidence and the witness accounts. "The prisoner beat the
16 victim, he strangled her with his hands and with her bra and also stuck her head in the toilet
17 and drowned her. According to the autopsy report the scalp showed 12 separate areas of
18 contusion and the cause of death was due to fresh water drowning and blunt force trauma."
19 RT 64.

20       Many of Lopez's arguments center on the theme that he was innocent and the BPH
21 acted improperly in viewing the victim's death differently than he had explained it. His
22 argument is unpersuasive. The BPH has no obligation to accept the prisoner's version of the
23 crime when there is evidence to the contrary. It also would make no sense for the parole
24 suitability decision to be made based on innocence: an innocent person would always be
25 suitable for parole and shouldn't be in prison in the first place. He has not shown that the
26 BPH relied on non-existent evidence but only that he has a different interpretation of the
27 same physical evidence and witness accounts. Lopez filed with his traverse investigative
28 reports of witness interviews and documentary evidence to support his version of the victim's

10

death, but that evidence was not shown to have been presented to the BPH and this habeas action is limited to determining the propriety of the BPH's decision based on the evidence the BPH had. See Sass, 461 F.3d at 1128-29.

There was sufficient evidence to support the finding that the circumstances of the commitment offense showed unsuitability. The evidence showed a prolonged and multi-faceted attack on the victim: she had been hit repeatedly, strangled and drowned. Significantly, this was the <u>initial</u> parole consideration hearing, so this case does not raise the issue of the repeated reliance on the commitment offense long into the prisoner's term of commitment. At the hearing held the ninth year into Lopez's 15-to-life sentence, due process would not have been violated had the BPH relied on the commitment offense alone to find Lopez unsuitable for parole.

b.  <u>Unstable Social History</u>

An unstable social history is specifically listed as a circumstance tending to indicate unsuitability. See 15 Cal. Code Regs. § 2402(c)(3).

The BPH relied on Lopez's unstable social history in support of the decision that he was not suitable for parole. He dropped out of high school in the tenth grade. RT 20, 64. Lopez began using alcohol and marijuana at age 15 or 16, and had abused marijuana and cocaine later in life. RT 20-21, 64. The murder was committed on a day when he was consuming cocaine and crack cocaine. RT 48, 64. Several of his many siblings also had drug abuse problems that led to their imprisonment. See RT 47.

There was sufficient evidence to support the BPH's reliance on this circumstance. The presence of the unstable social history alone would not alone support a finding that an inmate was unsuitable, but it could be considered as part of the overall picture. "Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." 15 Cal. Code Regs. § 2402(b).

c.  <u>Need For Further Programming</u>

Section 2402(b) specifically allows the BPH to consider a great range of relevant and reliable information, such as the prisoner's social history and mental state, as well as his "past

11

1  and present attitude toward the crime." 15 Cal. Code Regs. § 2402(b).

2  The BPH found that Lopez had programmed in a limited manner while incarcerated
3  and had failed to upgrade vocationally. The most significant concern, however, was that
4  Lopez had not yet acknowledged the extent of his responsibility for the killing.  The BPH
5  decision found that "[t]he prisoner needs to continue to participate in self-help in order to
6  face, discuss, understand, and cope with stress in a nondestructive manner.  Until progress is
7  made the prisoner continues to be unpredictable and a threat to others." RT 65.  The
8  commissioners made it very clear that they did not believe Lopez's version of the events and
9  that his failure to take responsibility affected their view of his suitability.  Commissioner
10 Daley stated, "But you have not come to terms with the act that was committed . . . . But in
11 the next three years you really need to come to terms, you need to admit to yourself and to
12 others as to what had occurred, you are very unbelievable here today." RT 68.
13 Commissioner Coldren said, "I concur with my colleagues that you need to take a deeper
14 look at your own behavior on this for your own good."  RT 68.

15 The BPH panel also ordered a new psychological evaluation because the existing one
16 appeared to be inconsistent with the autopsy and police reports. See RT 66, 67.  The panel
17 was concerned that the psychological evaluation had been prepared accepting as true Lopez's
18 explanation of the events in which he was innocent of murder. See RT 32-33, 67.  One panel
19 member specifically directed that, in preparing the new psychological evaluation, the "doctor
20 should absolutely read the police report to see the severity of the trauma that was caused to
21 the victim which is totally inconsistent with how the inmate is saying the victim received the
22 injuries." RT 67.

23 The BPH had some evidence to support its decision that Lopez needed further
24 programming.  An inmate is not required to admit to the crime or even to testify at the parole
25 hearing. See 15 Cal. Code Regs. § 2236.  However, the presence of remorse and the
26 prisoner's attitude toward the crime are factors that the BPH can properly consider in
27 determining whether he is suitable. See 15 Cal. Code Regs. § 2402(b) and (d)(3).  As long as
28 Lopez sticks with his story of innocence, he will not fare well on the criteria related to his

12

1  remorse and attitude toward the crime.  As with Lopez's protestations of his innocence, the
2  BPH was not required to accept as sufficient remorse Lopez's view that he feels his
3  responsibility for the death of the victim is limited only to failing to perform CPR or summon
4  medical aid.  The physical evidence and the witness statements, as well as Lopez's
5  unexplained statement that he only pled guilty because his attorney advised him to do so,
6  provided ample support for the BPH panel members' belief that he needed further
7  programming.

          d.      <u>There Was Enough Evidence To Support The Decision</u>

9          As noted above, this was the initial parole consideration hearing and was held nine
10 years into Lopez's 15-to-life sentence.  The commitment offense, unstable social history and
11 need for further programming provided some evidence to support the BPH's decision that
12 Lopez was not suitable at that time for parole.
13         The Orange County Superior Court noted that the some evidence standard applied and
14 was satisfied here.  That court noted, among other things, that Lopez's statements regarding
15 the offense were inconsistent with the autopsy and police report, that he had an unstable
16 social history based on his extensive use of drugs and alcohol from an early age, that he had
17 not upgraded vocationally and "planned to return to the same employment he had had during
18 the years he abused drugs."  Resp. Exh. 7, p. 3.
19         The Orange County Superior Court's determination that the circumstances relied on by
20 the BPH to find Lopez unsuitable were supported by some evidence was not an unreasonable
21 application of or contrary to the <u>Superintendent v. Hill</u> standard.   He is not entitled to the
22 writ on this claim.
23 B.     <u>Breach Of Plea Agreement Claim</u>
24         Lopez next contends that the BPH's determination that he was not suitable for parole
25 violated his plea agreement.  He does not identify any particular term in that agreement that
26 he was to be released on a date certain or after a certain number of parole hearings – indeed,
27 he admits that the term was not stated on the record.  <u>See</u> Petition, attachment, p. 8.  Rather,
28 his argument is that the plea agreement has been breached in that the BPH has not adhered to

the statute so that he would "have his parole date set upon eligibility in ten years and in accordance with the regulatory matrix." Id.

"Plea agreements are contractual in nature and are measured by contract law standards." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting United States v. De la Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993)). Although a criminal defendant has a due process right to enforce the terms of a plea agreement, see Santobello v. New York, 404 U.S. 257, 261-62 (1971), there is no evidence that Lopez's subjective expectations about how parole would be decided were part of the plea agreement. To the extent "eligibility" for parole means that he would be considered for parole, Lopez did receive that consideration: the parole hearing at issue in this case occurred less than ten years after he was sentenced. To the extent he believes eligibility means actual release on parole, he has not shown that such a term existed in his plea agreement or that the statute required actual release. Eligibility does not mean suitability, and under state law (as it existed when he was sentenced and as it exists now), the inmate must be found suitable before his term and release date are set.

The Orange County Superior Court rejected this claim without explanation. Resp. Exh. 7, p. 2 (noting that the claim had been raised). That unexplained rejection means that this court does an independent review of the record to decide whether the state court's decision was objectively reasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Having done so, this court concludes that there was no breach of the plea agreement because there was no promise that Lopez would be found suitable for parole and paroled on a particular date. Cf. Brown v. Poole, 337 F.3d at 1157-58, 1160 ("Brown heard and acknowledged the prosecutor's promises, and in the process of waiving her right to trial she accepted them as part of her bargain. 'The intent of the parties becomes clear upon an examination of the language of the plea agreement and the conduct of the parties' during the plea colloquy.") Lopez's agreed-upon sentence included a maximum of life imprisonment and the BPH has not kept him in custody beyond that term. The Orange County Superior Court's rejection of Lopez's breach of plea agreement claim was not an unreasonable

application of or contrary to clearly established federal law as determined by the U.S. Supreme Court.  Lopez's claim that his plea agreement was breached in violation of his right to due process fails.

Finally, Lopez repeatedly argues in the traverse that he did not understand his guilty plea when he made it.  <u>See, e.g.,</u> Traverse, pp. 1-2, 4.  That is a different claim from a claim that the BPH breached the agreement that was made.  If Lopez wants to assert a claim that his guilty plea was not knowingly made, he would have to do so in a separate action because it is a challenge to the conviction and sentence rather than a challenge to the execution of that sentence.  The proper venue for a petition challenging the conviction and sentence is in the Central District of California because Lopez was convicted in Orange County, within that district.  (By contrast, Lopez's challenge to the parole suitability decision is a challenge to the execution of his sentence and is properly brought in this district because it is the district in which he is confined.  <u>See</u> 28 U.S.C. § 2241(d); Habeas L. R. 2254-3(a).)  Any petition challenging the conviction or sentence would, of course, be subject to the usual habeas procedural requirements, such as the requirements that the petitioner file it within the one-year habeas statute of limitations, 28 U.S.C. § 2244(d), that he exhaust state court remedies before filing the petition, 28 U.S.C. § 2254(b), and that his first petition contain all his challenges so as to avoid the limits on second and successive petitions, 28 U.S.C. § 2244(b).

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED:   April 25, 2007

_____
Marilyn Hall Patel
United States District Judge

15

## **NOTE**

1. The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).